UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JOSHUA CLASBY,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF NEWTON,<br>COUNTY OF JASPER,<br>RILEY BRITTON,<br>ADAM DECKARD,<br>GREGORY COKER,<br>DUSTIN LEVITT, and<br>GARRETT FINN,<br><br>Defendants. | Case No. 25-cv-01171-JPG |

**MEMORANDUM AND ORDER**

This case is before the Court on two motions for summary judgment, both of which ask the Court to enter summary judgment against Plaintiff Joshua Clasby on all eight of his claims. The first motion was filed by Defendants City of Newton ("the City"), Riley Britton ("Chief Britton"), Adam Deckard, and Gregory Coker (collectively "the Newton Defendants") (Doc. 46). Plaintiff filed a response (Doc. 61), and the Newton Defendants filed a reply (Doc. 67). The second motion was filed by Defendants County of Jasper ("the County"), Dustin Levitt, and Garrett Finn (collectively "the Jasper County Defendants") (Doc. 55). Plaintiff filed a response (Doc. 65), and the Jasper County Defendants filed a reply (Doc. 72).

## I. BACKGROUND

The material facts of this case are contested. The relevant evidence and the reasonable inferences that can be drawn from that evidence, viewed in the light most favorable to Plaintiff, establish the following facts.[1]

[1] There is footage of the incident from multiple different angles. To the extent any of the facts alleged are "blatantly

On May 31, 2024, Plaintiff was arrested for a DUI, transported to the Jasper County Jail in Newton, Illinois, and placed in a segregated holding cell. Defendant Officers[2] perceived Plaintiff to be visibly intoxicated at the time of the DUI arrest and in the holding cell thereafter.

Upon being placed inside the holding cell, Plaintiff began to bang his head, hands, and feet against the walls and door of the cell, causing himself physical injury. He continued to punch the walls and door of the holding cell to the point that his knuckles began to bleed profusely, and his blood splattered around the cell.

Levitt told Plaintiff that he was a danger to himself and warned him repeatedly that he would need to be placed in the restraint chair if he did not stop harming himself. Shortly thereafter, Plaintiff continued to bang his head, hands, and feet against the walls and door of the holding cell. He then took the shoelaces from his loafers, placed them around his neck, and began making movements as if he were trying to choke himself.

At this point, the Defendant Officers decided to intervene and place Plaintiff in a restraint chair. Deckard entered Plaintiff's holding cell first, followed by Levitt and Coker, while Finn stood at the door. Plaintiff had been laying down on the cell floor for approximately 30 seconds when the Defendant Officers entered. Deckard reached down to get the shoelaces from Plaintiff's neck, and Plaintiff swatted both his hands upward toward Deckard. Deckard then positioned himself on Plaintiff's legs, while Levitt and Coker positioned themselves on Plaintiff's sides and attempted to handcuff him.

As they were trying to handcuff him, Plaintiff told the Defendant Officers, "I'm fuckin'

---

contradicted" by the footage, and the footage is "so definitive that there could be no reasonable disagreement about what the video depicts," the Court has viewed the facts in the light depicted in the video. *See Kailin v. Vill. of Gurnee*, 77 F.4th 476, 481 (7th Cir. 2023).

[2] The Court will use "Defendant Officers" to refer collectively to individual officers Deckard, Coker, Finn, and Levitt.

stronger than you think I am" and "get the fuck off me," while holding his arms rigidly together. Plaintiff was told "relax dude," to which he responded, "no I won't," and continued to flail and resist. Levitt pushed Plaintiff's head toward the floor to keep his face still, but he was only able to do so for approximately 12 seconds. Plaintiff then grabbed Deckard's belt and struck him in the side.

Coker attempted to use other force tactics, such as pressure points, to gain compliance from Plaintiff but was unsuccessful. He then asked for a taser. Coker testified that he asked for a taser because Plaintiff was holding his arms together, preventing the officers from placing him in handcuffs, and Coker was concerned that he would dislocate Plaintiff's shoulder if he opted to pull on his arm instead. After Coker asked for a taser, Plaintiff said, "you gonna tase me?" and Coker responded, "yep."

Coker tased Plaintiff four times over the course of approximately 45 seconds. Approximately 5 seconds or more passed between each use of the taser, and intermittently, the Defendant Officers provided Plaintiff with warnings and instructions for compliance, including "hands behind your back," "on your stomach," and "stand on your feet." Coker deployed the taser in "drive stun mode" only and deployed it on Plaintiff's "back area" and/or "side."

After the first deployment of the taser, Plaintiff screamed. Deckard asked, "want it again?" and Coker said, "want more?" Plaintiff then asked why he was being tased. Coker applied the taser for a second time, and the Defendant Officers commanded Plaintiff to get on his stomach. Plaintiff responded, "I don't know what to do." Coker deployed the taser for a third time. At this time, Plaintiff was lying on his stomach, but not all the way on the ground, and only one of his arms was behind his back. His other arm remained uncontrolled, and the Defendant Officers could not place

him in handcuffs. After the fourth taser application, compliance was obtained, and Plaintiff was successfully placed on his stomach and in handcuffs. Coker then told Plaintiff, "If you comply, I won't tase you anymore."

Once Plaintiff was placed in the restraint chair, the Defendant Officers' called Emergency Medical Services ("EMS") to evaluate him. EMS arrived approximately 10 minutes later. While on the scene, EMS personnel spoke with Plaintiff, rubbed his sternum, cleaned and wrapped his bleeding knuckles, and checked his vital signs. After being evaluated by EMS and being released from the restraint chair, Plaintiff was talkative with the Defendant Officers.

Plaintiff was taken to the hospital the following day, where he was examined by a nurse. The visit lasted approximately one hour. There was no suggestion or diagnosis of any serious injury, such as a broken hand. Plaintiff has produced no medical records or other documentation reflecting continued harm from being tased.

The City's Controlled Energy Device Policy ("the Taser Policy") permits the use of a taser when the circumstances reasonably perceived by the officer indicate that its application reasonably appears necessary to control a person who is physically resisting or has demonstrated an intention to harm themselves, and directs officers to target the back, lower center mass, and upper legs of the subject. Verbal warnings are recommended but not required before using the taser, and medical evaluation is required after the subject is tased. Coker was up to date on his taser training at the time of the incident. The City, Deckard, and Coker have only been named in one other excessive force lawsuit in the preceding 10 years, and that lawsuit does not involve allegations of taser use and remains pending.

On June 2, 2025, Plaintiff filed a complaint asserting claims against the Defendant Officers

for excessive force, failure to intervene, inadequate medical care, conspiracy, and intentional infliction of emotional distress; claims against the City and the County for *Monell* liability and indemnification; and a claim against Chief Britton for failure to train, supervise, and retain officers.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *Archdiocese of Milwaukee v. Doe*, 743 F.3d 1101, 1105 (7th Cir. 2014) (citing FED. R. CIV. P. 56); *accord Anderson v. Donahoe*, 699 F.3d 989, 994 (7th Cir. 2012). In assessing a summary judgment motion, the Court views the facts in the light most favorable to and draws all reasonable inferences in favor of the nonmoving party. *Anderson*, 699 F.3d at 994; *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011). However, the "favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture." *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 503 (7th Cir. 2017) (quoting *Argyropoulos v. City of Alton*, 539 F.3d 724, 732 (7th Cir. 2008) (internal quotation marks and citation omitted)).

The initial summary judgment burden of production is on the moving party to show the Court that there is no reason to have a trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013). Where the moving party fails to meet its strict burden, the Court cannot enter summary judgment for the moving party even if the opposing party fails to present relevant evidence in response to the motion. *Cooper v. Lane*, 969 F.2d 368, 371 (7th Cir. 1992).

In responding to a summary judgment motion, the nonmoving party may not simply rest

upon the allegations contained in the pleadings but must present specific facts to show that a genuine issue of material fact exists. *Celotex*, 477 U.S. at 324; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–57 (1986); *Modrowski*, 712 F.3d at 1168–69. A genuine issue of material fact is not demonstrated by the mere existence of "some alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, or by "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, a genuine issue of material fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

## III. ANALYSIS

### A. Count 1 – Excessive Force Claim Against Defendant Officers:

To prove a defendant used excessive force in violation of the Fourteenth Amendment, a pretrial detainee must show that the defendant acted purposefully, knowingly, or perhaps even recklessly, in using force, and the defendant's conduct was objectively unreasonable. *Kingsley v. Hendrickson*, 576 U.S. 389, 395–97 (2015). The determination turns on the facts and circumstances of each particular case, viewed from the perspective of a reasonable officer in the defendant's position and based on what the officer knew at the critical time. *Id.* at 397. Relevant considerations include, but are not limited to:

> the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Id.*

No reasonable jury could find that the force used by the Defendant Officers was objectively unreasonable. Plaintiff was arrested for a DUI, taken to the Jasper County Jail, and placed in a

segregated cell. He almost immediately began banging his head, hands, and feet against the cell door, causing his knuckles to bleed profusely. Levitt told Plaintiff that he would need to be placed in a restraint chair if he did not stop. Despite this warning, Plaintiff continued to bang his head, hands, and feet against the cell door. He then took the shoelaces out of his loafers, placed them around his neck, and made movements as if he was trying to choke himself. At this point, it was clear that Plaintiff posed a threat to himself, and the Defendant Officers determined that intervention was necessary. Given Plaintiff's actions, the Defendant Officers' decision to enter the cell and place him in a restraint chair was objectively reasonable.

When the Defendant Officers entered Plaintiff's cell to place him in a restraint chair, Plaintiff actively resisted. Deckard reached down to get the shoelaces from Plaintiff's neck, and Plaintiff swatted both his arms upward toward Deckard. Deckard then positioned himself on Plaintiff's legs, while Levitt and Coker positioned themselves on Plaintiff's sides and attempted to restrain his arms. Plaintiff told the Defendant Officers, "I'm fucking stronger than you think I am," and "get the fuck away from me," while he held his arms rigidly together, preventing Coker and Levitt from placing him in handcuffs. Plaintiff was told "relax dude," to which he responded, "no, I won't," and then flailed his arms and grabbed Deckard's belt. Because Plaintiff actively resisted being handcuffed, it was objectively reasonable for the Defendant Officers to attempt to use minimal force to restrain him, including lying across his legs, attempting to pull his hands apart, and pushing his head to the floor, and to use pressure points to obtain compliance.

Once other compliance techniques failed, Coker asked for a taser. Plaintiff said, "you gonna tase me?" and Coker responded "yep." Despite this warning, Plaintiff continued to resist. Coker applied the taser four times over the course of approximately 45 seconds and waited at least

five seconds between each application. Commands were given between each application, and Plaintiff did not comply with them. It was not until the fourth application that Plaintiff finally rolled onto his stomach and the Defendant Officers were able to handcuff him. Since Plaintiff was actively resisting and other compliance techniques failed, it was objectively reasonable for Coker to use a taser to obtain compliance. It was also objectively reasonable for Coker to apply the taser four times. Plaintiff did not comply with the Defendant Officers' commands and was not fully restrained until after the fourth taser application, the taser was used only in stun gun mode, and Plaintiff suffered no injury from its use.

Even if the Defendant Officers' conduct was unreasonable, they are entitled to qualified immunity. Qualified immunity is an affirmative defense that shields government officials from liability for civil damages where their conduct does not violate clearly established constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The qualified immunity test has two prongs: (1) whether the facts shown, taken in the light most favorable to the party asserting the injury, demonstrate that the officer's conduct violated a constitutional right, and (2) whether the right at issue was clearly established at the time of the alleged misconduct. *Pearson*, 555 U.S. at 232.

The plaintiff bears the burden of demonstrating that a constitutional right is clearly established. *Leiser v. Kloth*, 933 F.3d 696, 701 (7th Cir. 2019). To carry this burden, the plaintiff must point to "a reasonably analogous case that has both articulated the right at issue and applied it to a factual circumstance similar to the one at hand." *Id.* The plaintiff "need not point to an identical case finding the alleged conduct unlawful" but he "must point to precedent placing the

'statutory or constitutional question beyond debate.'" *Schimandle v. Dekalb Cnty. Sheriff's Off.*, 114 F.4th 648, 655 (7th Cir. 2024) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)).

Here, Plaintiff has failed to meet his burden of showing that the Defendant Officers violated a clearly established constitutional right. He cites *Dockery v. Blackburn*, 911 F.3d 458 (2018), *Abbott v. Sangamon Cnty.*, 705 F.3d 706 (7th Cir. 2013), and *Cyrus v. Town of Mukwonago*, 624 F.3d 856 (7th Cir. 2010), but none supports his claim. Plaintiff does not even argue that any of these cases are reasonably analogous to this case. Instead, he argues that the cases establish that force must remain proportional as circumstances change. It is unclear how this broad proposition, without more, demonstrates that the Defendant Officers violated a clearly established right. Still, the Court has independently reviewed the cases and finds that none shows that the Defendant Officers violated a clearly established right.

*Abbott* and *Cyrus* are distinguishable. In *Abbott*, the Seventh Circuit held that a reasonable jury could find that the second taser deployment was excessive because the first application had incapacitated the subject, causing her to fall to the ground and cease moving. 705 F.3d at 729–30. Here, by contrast, Plaintiff was not subdued until after the fourth taser application. Any claim otherwise is blatantly contradicted by definitive video evidence. *Cyrus* involved a subject who, after an initial taser shock, barrel-rolled down a driveway before stopping and lying still with his hands underneath him, yet officers deployed the taser several additional times. 624 F.3d at 859–60. The Seventh Circuit determined that the summary judgment was improper because there were genuine issues of material fact regarding how many times the taser was discharged, whether the barrel-roll could be interpreted as an attempt to flee, and whether the suspect posed a risk to the officers while lying face down. *Id.* at 862–63. In this case, there is no similar evidentiary dispute,

as the parties agree that the taser was used four times and the video evidence clearly shows that Plaintiff was not subdued until the fourth taser deployment. Also, unlike here, the suspect in *Cyrus* was tased possibly twelve times and died because of the officers' conduct.

*Dockery* supports the conclusion that the Defendant Officers did not violate a clearly established right. In *Dockery*, the plaintiff became physically aggressive when officers attempted to handcuff him during booking, prompting an officer to deploy her taser four times. 911 F.3d at 462–63. The Seventh Circuit held that all four deployments were protected by qualified immunity. *Id.* at 469. The first was protected because the plaintiff was uncooperative and physically aggressive; the subsequent three were protected because the plaintiff did not submit to the officers' authority after the first shock. *Id.* at 467–68. The same is true here. At the time the first taser application, Plaintiff was actively resisting being handcuffed. Although the first application caused Plaintiff to scream in pain, he continued to resist and disregard the Defendant Officers' commands. Plaintiff did not comply with the Defendant Officers' commands until after the fourth taser application, when he finally lay fully on his stomach with his hands behind his back, allowing the Defendant Officers to handcuff him.

Because the Court finds that the Defendant Officers' use of force was objectively reasonable, and that Plaintiff has not met his burden to show that the Defendant Officers violated a clearly established right, it will grant summary judgment to the Defendant Officers on Count 1.

B. <u>Count 2 – Failure to Intervene Claim Against Defendant Officers:</u>

An officer can be liable for failing to intervene to stop excessive force when he has reason to know that another officer is using excessive force, he has a realistic opportunity to intervene to prevent the harm, and he fails to do so. *Jackson v. City of Madison*, 176 F.4th 1005, 1016 (7th Cir.

2026). Without excessive force, an officer cannot be held liable for failure to intervene to prevent excessive force. *See id.* (stating that the first element of failure to intervene is "that excessive force was being used"); *Doxtator v. O'Brien*, 39 F.4th 852, 864–65 (7th Cir. 2022). As explained above, the Defendant Officers did not use excessive force against Plaintiff. Therefore, Plaintiff's failure to intervene claim fails, and the Court will grant summary judgment to the Defendant Officers on Count 2.

C. Count 3 – Inadequate Medical Care Claim Against Defendant Officers:[3]

To prevail on a claim for failure to provide medical care, a pretrial detainee must prove that: (1) he suffered an objectively serious medical need; (2) the defendant acted purposefully, knowingly, or recklessly in denying him medical care; and (3) the defendant's actions were objectively unreasonable. *See McGee v. Parsano*, 55 F.4th 563, 569 (7th Cir. 2022); *Miranda v. Cnty. of Lake*, 900 F.3d at 352. If a pretrial detainee is "under the care of medical experts, non-medical jail staff may generally trust the professionals to provide appropriate medical attention." *Miranda*, 900 F.3d at 343. However, there is an exception where the non-medical jail officer "had reason to know that their medical staff were failing to treat or inadequately treating an inmate." *Id.*

No reasonable jury could find that the Defendant Officers' actions were objectively unreasonable. Just ten minutes after Plaintiff was placed in the restraint chair, EMS personnel arrived on the scene to provide him with medical treatment. They spoke to Plaintiff, looked him over, cleaned and wrapped his bleeding knuckles, and checked his vitals. To the extent Plaintiff contends that EMS personnel stated that he needed hospital treatment and that, after he was placed

[3] Plaintiff's complaint styles this claim as "Deliberate Indifference to Serious Medical Needs," but the relevant standard for a pretrial detainee, like Plaintiff, is whether the defendant's response to his medical needs was objectively reasonable. *See Miranda v. County of Lake*, 900 F.3d 335, 352 (7th Cir. 2018).

in general population, he asked a jailer to go to the hospital and, in response, the jailer laughed and said he would have to wait for someone to transfer him, those allegations do not create a genuine issue of material fact. Section 1983 liability hinges on personal involvement, *Minix v. Canarecci*, 597 F.3d 824, 833 (7th Cir. 2010), and Plaintiff does not allege that any of the Defendant Officers were present when these statements were made. Plaintiff was taken to the hospital the next day. The visit lasted approximately one hour. There was no suggestion or diagnosis of any serious injury, such as a broken hand. Plaintiff has produced no medical records or other documentation reflecting continued harm from being tased. Plaintiff simply does not point to any evidence that his medical condition was sufficiently serious to make the Defendant Officers' failure to summon additional medical care objectively unreasonable.

His claim against Finn and Levitt fails for another reason: they have raised the defense of qualified immunity, and Plaintiff has not pointed to "a reasonably analogous case that has both articulated the right at issue and applied it to a factual circumstance similar to the one at hand." *Leiser*, 933 F.3d at 701. For these reasons, the Court will grant summary judgment to the Defendant Officers on Count 3.

D. <u>Count 4 – Conspiracy Claim Against Defendant Officers:</u>

"[T]o establish a prima facie case of a civil conspiracy, a plaintiff must show (1) an express or implied agreement among defendants to deprive plaintiff of his or her constitutional rights and (2) actual deprivations of those rights in the form of overt acts in furtherance of the agreement." *Scherer v. Balkema*, 840 F.2d 437, 442 (7th Cir. 1988). "Section 1983 does not . . . punish conspiracy; an actual denial of a civil right is necessary before a cause of action arises." *Goldschmidt v. Patchett*, 686 F.2d 582, 585 (7th Cir. 1982). As described above, the Defendant

Officers did not deny Plaintiff a civil right. Further, there is no evidence that the Defendant Officers entered into an agreement to harm and punish Plaintiff, or to deprive him of his rights to due process and a fair trial.[4] Instead, the evidence shows that the Defendant Officers acted reasonably in responding to a real-time situation involving a pretrial detainee who engaged in self-harm and then actively resisted while the Defendant Officers attempted to restrain him. Thus, the Court will grant summary judgment to the Defendant Officers on Count 4.

E. Count 5 – *Monell* Claim Against the City and the County:

A municipality may not be held vicariously liable for the actions of its employees under § 1983 on a *respondeat superior* theory. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978). It may be liable, however, for its own actions as a municipality. *Id.* at 690–92. A municipal action occurs where (1) the municipality had an express policy calling for a constitutional violation, (2) the municipality had a widespread practice of constitutional violations that was so permanent and well settled as to constitute a custom or usage with the force of law, or (3) if a person with final policymaking authority for the municipality caused the constitutional violation. *Id.* at 694. And the policy, custom, or decision must be the moving force behind the constitutional violation. *Id.*

A municipality's failure to train its police officers can serve as a basis for § 1983 liability when the failure "amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989); *Flores v. City of South*

---

[4] Plaintiff claims that, after the incident, Levitt told Coker, "Hey Greg that tasing was a good idea," and Coker responded, "NO SENSE IN MESSING AROUND WITH THAT MOTHER FUCKER." However, the exhibit that Plaintiff cites to in support of this fact was never submitted to the Court. Thus, the Court has disregarded this fact. *See* SDIL-LR 56.1(f) (stating that "[t]he Court will disregard any asserted fact that is not supported with a citation to the record").

*Bend*, 997 F.3d 725, 731 (7th Cir. 2021). Deliberate indifference requires the plaintiff to show that the municipality disregarded a "known or obvious" risk that its failure to train would result in a constitutional violation. *J.K.J. v. Polk Cnty.*, 960 F.3d 367, 379–80 (7th Cir. 2020) (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997)). Generally, this requires "proof of a prior pattern of similar constitutional violations." *Id.* at 380. However, where "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights," a municipality's failure to train may constitute deliberate indifference even without a similar prior constitutional violation. *Harris*, 489 U.S. at 390.

Plaintiff's *Monell* claim fails for two reasons. First, there is no underlying constitutional deprivation. *See Swanigan v. City of Chicago*, 775 F.3d 953, 962 (7th Cir. 2015) ("If the plaintiff fails to prove a violation of his constitutional rights in his claim against the individual defendants, there will be no viable *Monell* claim based on the same allegations."). Second, Plaintiff has not shown the existence of any policy or practice of constitutional violations or any failure to train, supervise, or discipline that amounted to deliberate indifference. With respect to the City, Plaintiff argues that: (1) Coker failed to comply with the Taser Policy by not providing a warning before tasing him; (2) the evidence concerning de-escalation raises questions relevant to training and implementation; and (3) the City, Coker, and Deckard were named in one excessive force lawsuit in the past 10 years. None of these arguments are sufficient to prove a *Monell* claim. The failure to comply with a department policy, by itself, does not establish a constitutional violation. *See Thompson v. City of Chicago*, 472 F.3d 444, 454 (7th Cir. 2006). Raising questions about Coker and Deckard's training is not enough; Plaintiff must point to a specific failure to train that amounts to deliberate indifference. One prior lawsuit is not sufficient to establish *Monell* liability. *See*

*Fields v. City of Chicago*, 981 F.3d 534, 561–62 (7th Cir. 2020). As for the County, Plaintiff contends that the facts of this case permit scrutiny of whether its training, supervision, review, and practices were adequate despite the existence of written policies. Again, that is not sufficient to prove *Monell* liability. For the County to be held liable under *Monell*, Plaintiff must point to a policy or practice of constitutional violations or to a specific failure to train that amounts to deliberate indifference. He has failed to do so. Thus, the Court will enter summary judgment to the City and the County on Count 5.

F. Count 6 – Failure to Train, Supervise, and Retain Officers Claim Against Chief Britton:

This claim appears to allege the same failure to train allegations as Count 5, but this time against Chief Britton. However, as stated above, there is no underlying constitutional deprivation, and Plaintiff has failed to point to any policy or practice of constitutional violations or to a failure to train that amounts to deliberate indifference. As such, the Court will grant summary judgment to Chief Britton on Count 6.[5]

G. Count 7 – Intentional Infliction of Emotional Distress Claim Against Defendant Officers:[6]

To prevail on a claim for intentional infliction of emotional distress ("IIED"), a plaintiff must prove that (1) the conduct involved was "truly extreme and outrageous," (2) the defendant either intended to inflict, or knew there was a high probability he would cause, severe emotional distress, and (3) the defendant actually caused severe emotional distress. *Feltmeier v. Feltmeier*,

[5] To the extent this claim is brought against Chief Britton in his individual capacity, it fails because he was not present during the alleged constitutional deprivations.

[6] Plaintiff's complaint lists two claims as Count 6: (1) failure to train, supervise, and retain officers against Chief Britton; and (2) IIED claim against Defendant Officers. For the purposes of this Order, the Court will label the IIED claim as Count 7.

798 N.E.2d 75, 80 (Ill. 2003) (quoting *McGrath v. Fahey*, 533 N.E.2d 806, 809 (Ill. 1988)). To support an IIED claim, the conduct must be "so severe that no reasonable man could be expected to endure it." *Id.* (quoting *McGrath*, 533 N.E.2d at 809). "Conduct is of an extreme and outrageous character where 'recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!''" *Doe v. Calumet City*, 641 N.E.2d 498, 507 (Ill. 1994) (quoting Restatement (Second) of Torts § 46 cmt. d (A.L.I. 1965)).

Because Defendant Officers have immunity for their acts and omissions in the execution and enforcement of the law, 745 ILCS 10/2-202, and for their failure to furnish or obtain medical care for a pretrial detainee in their custody, 745 ILCS 10/4-105, the standard is even higher. Plaintiff must show that the Defendant Officers' conduct was willful and wanton conduct. Willful and wanton conduct is defined as "a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property." 745 ILCS 10/1-210.

No reasonable jury could find in Plaintiff's favor on his IIED claim. To begin, the Court already found that Defendant Officers' conduct was objectively reasonable and, therefore, was not willful and wanton. *See Horton v. Pobjecky*, 883 F.3d 941, 954 (7th Cir. 2018). In addition, in cases involving excessive force by a police officer, extreme and outrageous conduct requires that the force used "be very extreme or cause very severe physical injury." *DuFour-Dowell v. Cogger*, 969 F. Supp. 1107, 1123 (N.D. Ill. 1997). That standard is not met here because the force used by the Defendant Officers caused Plaintiff no injury. Accordingly, the Court will grant summary judgment to the Defendant Officers on Count 7.

H. <u>Count 8 – Indemnification Claim Against the City and the County:</u>

Under 745 ILCS 10/9-102, a local public entity, such as the City or the County, must "pay any tort judgment . . . for which it or an employee while acting within the scope of his employment is liable." Here, however, the Court will enter judgment in the Defendants' favor on all counts. As a result, the Court will grant summary judgment to the City and the County on Count 8.

## IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS** the Newton Defendants' Motion for Summary Judgment (Doc. 46) and the Jasper County Defendants' Motion for Summary Judgment (Doc. 55). It **DIRECTS** the Clerk of Court to enter judgment accordingly and close the case.

**IT IS SO ORDERED.**
**DATED**: **October 23, 2026**

J. Phil Gilbert

**J. PHIL GILBERT**
**United States District Judge**